#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULES JETTE, : | |
|         Petitioner, : | |
| : | |
| v. : | Civ. No. 12-2379 |
| : | |
| STEVEN GLUNT *et al.*, : | |
|         Respondents. : | |

### O R D E R

Habeas Petitioner Jules Jette, who is represented by counsel, has filed a single Objection to Magistrate Judge Lloret's recommendation that I deny relief. (Doc. Nos. 101, 110); 28 U.S.C. § 2254. I will overrule Jette's Objection, adopt Judge Lloret's Report and Recommendation, and deny the Petition.

**I.     LEGAL STANDARDS**

I must review *de novo* those portions of the Report to which timely, specific objections have been filed. 28 U.S.C. § 636(b)(1)(C). I may "accept, reject, or modify, in whole or in part" Judge Lloret's findings or recommendations. Id.; Brophy v. Halter, 153 F. Supp. 2d 667, 669 (E.D. Pa. 2001). As to those portions to which no objections have been made, I must "satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b) advisory committee's note to the 1983 amendment; see Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987) (district court must "afford some level of review" when no objections have been made).

I may grant habeas relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d). The state court's decision must be "objectively unreasonable"; I may not grant relief "merely because [I] conclude that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005); see also Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) ("[A] federal court may not overturn a state court decision . . . simply because the federal court disagrees with the state court."). I must review *de novo*, however, preserved federal claims that were not decided by the state courts on the merits. See Cone v. Bell, 556 U.S 449, 468, 472 (2009).

I must conduct an evidentiary hearing "unless the [§ 2254] motion and files and records of the case show conclusively that [the petitioner] is not entitled to relief." United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008).

## II.   BACKGROUND

The Pennsylvania Superior Court summarized the underlying facts:

> The record reveals that Jette repeatedly raped and sexually assaulted the minor victim, who was the son of his live-in girlfriend, during 1993 and 1994, starting when the victim was eight years old. The record further reveals that "after [Jette] committed these acts, which included anal penetration and oral sex including ejaculating in [the victim's] mouth, he would tell [the victim] that he would kill him if he told anyone and that nobody cared about him and they would not believe him." The victim's mother eventually learned of the abuse in 1995 and the police began an initial investigation that subsequently was dropped. After the police renewed their investigation, the victim told a police detective that Jette had abused him almost daily during the two-year period. The trial court notes that at that time, the victim "described four of the worst incidents, describing generally when they occurred by month and generally what time of the year."

Commonwealth v. Jette, 818 A.2d 533, 534 (Pa. Super. 2003) (internal footnote and citations omitted) (quoting Commonwealth v. Jette, No. 1188, at 2–3 (Pa. Ct. Com. Pl. May 20, 2002).

At Jette's October 1, 2001 bench trial, the victim, J.R., testified to the four abuse incidents that occurred when he was eight to nine years old. (See N.T. 10/1/2001, at 10–33.) He also

2

testified about "My Life"—a document he had written two years before trial, in which he described some of the abuse. (Id. at 33–36.) Jette was represented by Jeffrey Minehart, an extremely experienced, capable lawyer (now a Common Pleas Court Judge). Mr. Minehart cross-examined the victim regarding the inconsistencies between the "My Life" account, J.R.'s trial testimony, J.R.'s preliminary hearing testimony, and the police statements he gave in 1995 and 2000. (See id. at 45–85.)

The victim's mother, Joanne R. (who was Jette's ex-wife), testified about the relationship she and her son had with Jette, how she learned of the abuse, and how the abuse has affected J.R. (Id. at 92–116.) The Commonwealth's last witness was Detective Kenneth Roach, who testified about his investigation of the abuse allegations, including his 2000 interview with J.R. (Id. at 116–20.)

Following the Commonwealth's case-in-chief, Mr. Minehart presented five character witnesses, as well as Jette's mother. (Id. at 120–25.)

In closing arguments, Mr. Minehart pointed to "troubling" aspects of the Commonwealth's case (including the decision not to prosecute in 1995 and the timing of the allegations), highlighted the discrepancies among the victim's various statements, and emphasized Jette's "outstanding character." (Id. at 133–40.) The Commonwealth emphasized the credibility of its witnesses, noting J.R.'s demeanor throughout the investigation and trial, and his lack of motive to lie. (Id. at 40–45.)

The trial court convicted Jette of involuntary deviate sexual intercourse, endangering the welfare of a child, and corrupting the morals of a minor, acquitting him of rape. (Id. at 145–46.) Jette was sentenced to ten to twenty years in prison, followed by twelve years of probation. (N.T.

3

1/8/2002, at 20.) Judge Lloret has admirably summarized the case's intricate subsequent history. (See Doc. No. 101, R&R, at 2-7.)

In referring this matter, I asked Judge Lloret to consider: "(1) whether Petitioner has demonstrated PCRA counsel's ineffectiveness; and (2) whether the underlying ineffectiveness claims are meritorious. See 28 U.S.C. § 636(b)(1)(C)." (Doc. No. 49.) Judge Lloret concludes that Jette's merits claims are properly preserved for federal review and that "Jette's underlying ineffective assistance of trial counsel claims are all meritless . . . ." (R&R at 11.)

After several extensions, Jette filed a single Objection to Judge Lloret's Report & Recommendation.

### III. OBJECTION

Jette argues that Judge Lloret should have found Mr. Minehart ineffective for failing to introduce a letter written to Jette by the victim's mother:

> Trial counsel's failure to review the letter prevented him from (1) using the letter as impeachment evidence to undermine Joanne R.'s testimony about J.R.'s alleged fear of Mr. Jette and (2) using the letter to develop a theory that J.R. fabricated the sexual assault allegations because he was jealous of his mother's relationship with Mr. Jette.

(R&R at 2.) As I agree with Judge Lloret's analysis of this claim's procedural posture, I will evaluate it on the merits. (See R&R at 15, 57-61.)

First, Jette has never shown that the letter was available to Mr. Minehart, who testified that he could not recall ever seeing it before PCRA proceedings. (N.T. 7/31/05, 51-52) ("Q: Did the defendant give you a letter from the complainant's mother detailing events during their relationship? A: He might've. I have no recollection of that. . . . I don't remember ever seeing it before."). Obviously, counsel was not ineffective for 'failure' to use evidence that he did not have.

In any event, assuming *arguendo* that Mr. Minehart had the letter, Judge Lloret correctly

4

ruled that the letter could not properly have been used to impeach Joanne R.  466 U.S. 668, 687 (1984); United States v. Bui, 795 F.3d 363, 366–67 (3d Cir. 2015) ("'[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.'") (quoting United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999)); Barnes v. Burge, 372 F. App'x 196, 201 (2d Cir. 2010) (counsel's performance was not deficient for failure to pursue inadmissible testimony).

In his Objection, Jette argues only that the letter would have been admissible as Joanne R.'s prior inconsistent statement, urging the following "inconsistency": Joanne R. testified that the victim threatened to commit suicide if Jette moved back into her house.  In her letter, she notes that J.R. voluntarily went somewhere with his brother and Jette *after* the sexual assaults.  (See R&R at 14-16; Objections at 2-3).  But these two statements are not inconsistent: Joanne R. did not contradict herself; she described two distinct events.  This did not undermine her credibility. See Commonwealth v. Bailey, 469 A.3d 604, 611 (Pa. Super 1983) (dissimilarities or omissions in prior inconsistent statements must be substantial enough to cast doubt on a witness's testimony to be admissible); OHLBAUM ON THE PENNSYLVANIA RULES OF EVIDENCE § 801.10 (2019) (prior inconsistent statements are a hearsay exception because the "probative value of the statements does not depend on the out-of-court statement's truth but on the inconsistency or consistency that serves, respectively, to attack or support the witness's credibility.").  Accordingly, the letter was not admissible as a prior inconsistent statement and could not have been used to impeach Joanne R.

Nor did Mr. Minehart 'fail' to use the letter to develop a viable 'fabrication' theory.  As Judge Lloret correctly concluded, the letter cannot fairly be read to support such a theory.  (See R&R at 17-18.) ("This [fabrication] argument is extremely vague: Mr. Jette does not specify how

5

this theory would have manifested at trial . . . .") In his Objection, Jette argues that: (1) the letter shows that J.R. (in 1995) was jealous of his mother's relationship with Jette; (2) that J.R. thus had a motive (in 1995) to make up the abuse allegations; and (3) that, in turn, gave him a motive to lie in the 2000 investigation—to cover up that he had lied in 1995. (See Objections at 3-4.)

Several yawning gaps defeat this creative thesis. First,—as Jette acknowledges elsewhere—in 1995, J.R. "recanted" his abuse allegations when interviewed by the police. (Mem., Doc. No. 61 at 27; see also id. at 3-4 (describing how J.R.'s initially said that Jette had pinched him on the buttocks, but then withdrew the claim)). Yet, if J.R. had already 'recanted' the allegations in 1995, then he had no 'lies' in need of 'covering up' in 2000 when the investigation renewed. Moreover, Jette does not explain why J.R. had any motive in 2000 vastly to *expand upon* the five-year-old abuse allegations. In 1995, J.R. initially related (to the police and to his mother) only a small part of Jette's sexual abuse. (Id. at 6.) When J.R. was re-interviewed by the police in 2000, however, he related the full extent of Jette's abuse, including very difficult and embarrassing facts. (Id. at 4.) By this time, Jette and Joanne R. had been separated for years and there is nothing in the record even suggesting that they might reconcile. (R&R at 17-18.) The letter thus would not have shown that J.R. had a motive in 2000 to invent new allegations against Jette.

Moreover, there were objective, sound tactical reasons not to introduce the letter. See Strickland, 466 U.S. at 688-89 (trial counsel must have "wide latitude" in making tactical decisions). Mr. Minehart's strategy was to show that Jette was a man of "excellent" character. (See R&R at 3-4) (counsel called five character witnesses for Jette and highlighted their testimony in his closing argument); (see also N.T. 7/31/06, 22-25.) In her letter, however, Joanne R. discusses Jette's heroin addiction, his irresponsibility with money, and his failures as a father and

6

husband.  (See Joanne R. Letter at 1) ("The best example[] of [Jette's selfishness] is your addiction . . . .")

Using the letter would thus have undermined an important part of the defense strategy and possibly opened the door to the Commonwealth introducing highly damaging evidence.  See Commonwealth v. Nypaver, 69 A.3d 708, 116-17 (Pa. Super. 2013) ("A litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence."); see also Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999) ("Because counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing, we have cautioned that it is 'only the rare claim of ineffectiveness that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance . . . .") (internal citation omitted).

Significantly, Mr. Minehart's 'failure' to use the letter did not prejudice Jette.  See Strickland, 466 U.S. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.")  In evaluating prejudice, I must consider "the totality of the evidence" that was presented at Jette's trial.  Id.  As I have discussed, the letter's introduction could easily have harmed Jette.  Moreover, the letter would have added little to the defense.  For instance, Jette argues the letter would have shown that J.R. did not fear him, because the letter suggested that J.R. voluntarily went somewhere with Jette.  Yet J.R. had himself acknowledged this on cross-examination.  (See N.T. 10/1/2001, 84:16-25.)  Furthermore, on the occasion mentioned in the letter, because J.R. was accompanied by his brother, F.R., he would not have been ready prey for Jette's sexual attacks.  (See Mem. at 26.)  And, given J.R.'s testimony that Jette had threatened to kill him, it is hardly surprising that this child would 'voluntarily' go somewhere with his abuser.  (See N.T. 10/01/01 at 28:20-25.)

7

Finally, as I have discussed, the hypothetical 'fabrication' argument was, at least, exceedingly weak and so could not have caused the judicial fact finder reasonably to doubt that J.R.'s claims of abuse.

In sum, because Mr. Minehart was not ineffective for "failing" to use Joanne R.'s letter, I will overrule Jette's sole Objection. As the remainder of Judge Lloret's Report and Recommendation is plainly correct, I will adopt it and deny relief.

### IV.   CONCLUSION

**AND NOW**, this 13th day of January, 2021, upon consideration of the pleadings and record, and after careful review of Judge Lloret's Report and Recommendation (Doc. No. 101) and all related submissions, it is hereby **ORDERED** that:

1. Petitioner's Objection to the Report and Recommendation (Doc. No. 110) is **OVERRULED**;

2. Judge Lloret's Report and Recommendation (Doc. No. 101) is **APPROVED** and **ADOPTED**;

3. I will **DENY** Jette habeas relief without a hearing because the record conclusively demonstrates that he is not entitled to such relief. See United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008);

4. I will not issue a certificate of appealability because reasonable jurists would not debate the correctness of my ruling. See Slack v. McDaniel, 529 U.S. 473, 484 (2000);

5. Respondents shall mail a copy of this Order to Jette; and

6. The Clerk of Court shall **CLOSE** this case.

8

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.